We appreciate your record citations. First case of the morning, Mid-Continent Casualty v. Petroleum Solutions, Incorporated, is number 17-20652. We'll hear first from Mr. Shedlovsky. May it please the court. My name is Lee Shedlovsky and I represent Petroleum Solutions, Inc. This case, despite the multitude of opinions, the length of the record, really boils down to two crucial issues. One, does the cooperation clause in the Mid-Continent policy apply to an insured's affirmative claim against a third party? May I ask you just a question about that? Half of your initial brief was taken up with cooperation. And I understand how important it is, but you're not objecting to the court's ruling. You are not the appellant, and I just thought it was a little unusual that you were taking the appellee or cross-appellee position in your opening brief. Well, we are not objecting to the ultimate outcome in that case, that we did not cooperate that we did cooperate or that it was reasonably justified, only that it should have never gone to the trial court in the first place. And don't plan on spending a whole bunch of time, but you're correct. We won at the trial court, but the issue is of huge importance and could have cascading effect if, in fact, the court holds that the cooperation clause applies to an affirmative claim. But can't we just hold it doesn't matter? I suppose you can, but then the district court's opinion would stand as to it being a jury issue as to an affirmative claim. And that, again, based on the instruction that they wanted to give that you just have to do it. I'll just give a quick example. If it applies to an affirmative claim, if a general contractor has a retainage claim against an owner, the owner has a faulty workmanship claim against the insured that's an otherwise covered claim. And the owner says, well, we want to settle. Let's just settle. And the insurance company says, okay, let's just settle the case. Does the general contractor have to give up their affirmative claim? They would say yes. That's why this is the case. So to me, this seems like a reverse Stowers argument that your opponent is making, that, like, you have this kind of reverse Stowers obligation to settle when they tell you to, which is kind of interesting to me. But that said, they would argue, I think, that they're only talking about when it's the suit and not some other, like, la-di-da over here, but when it's in the suit. And I think they would say, having paid for the affirmative claim, why can't they be in charge of it? So if you could respond to that. Well, it's true that they said that they paid for this claim. They paid for this claim, again, not on our request. We never said, please pay for the claim. They paid for the claim because it was to their benefit for us to have that claim because it deflected cost. If we would have prevailed on that claim or any type of claim like that, it would take away money that they would, in theory, owe on a covered claim. But the issue still is, remember, this is a cooperation clause that applies to insurance. It's dangerous precedent if you hold that an insurance company can have control over an insurance affirmative claim and what they say. But, you know, what about the golden rule? He who has the gold makes the rules. I mean, if you wanted to have unilateral control, of course, you could have said, don't pay for our third-party affirmative claim. You could have. But that's why, to me, that's what sets up the question that becomes a fact issue here because it was a suit. It was a suit. And by the definition within the policy, a suit includes civil proceedings. And it doesn't say whether they're cross-claims, counter-claims, third-party claims or whatever, right? So it's within the clause. But then Mid-Continent also, as I understand their brief, could have settled without your approval at all. Settled the claim. But they didn't. And that's why there's waiver. No, they could have settled because it's within this. This is my interpretation. But, I mean, I appreciate your reaction. But I think suit means suit. And since they are entitled to defend any suit, and I take the word defense seriously, but what they're doing is setting up the way in which they think the minimum exposure will occur. And yet they waived that. They had the right to do the third-party affirmative claim. They paid for it. But then they voluntarily let you control the outcome. I don't dispute that the civil proceeding doesn't say whether it applies to affirmative claims, counter-claims. But the lead-in to that whole thing is claims against the insurer. It's a liability policy, not a first-party policy. So it's all premised on claims against the insured. And MidContinent, in their own reply brief, acknowledged that no policy provision gives them the right to settle an insured affirmative claim. They've acknowledged that. They said, but you have a duty to cooperate. And, I mean, they didn't settle the head matter anyway. Correct. And that wouldn't have been settled by the agreement here. Correct. And they were defending a reservation of rights. Does that matter? If they had been unconditionally defending, could that have any impact here? So we had a footnote in the district court that Judge Atlas acknowledged where we said, look, we still don't think the cooperation clause ever applies to an affirmative claim. But they'd have a much stronger equitable argument that it does if, in fact, they were defending under ‑‑ defending as an unqualified defense because then there's no risk on the insured. And to prove that point, let me just raise one more issue on the cooperation clause. They have not cited a single case across the country. Judge Atlas didn't find a single case across the country. We didn't find a single case. I found it a shocking argument. It applies to an affirmative claim. So in their reply brief in this Court, they found one case. And they said this case, the Hubel case out of Missouri that was affirmed by the Eighth Circuit, says here's a case that says the cooperation clause applies to an affirmative claim and a claim for indemnification. I was a little bit worried. I read the case. I'm not worried anymore. The case, and that is a hybrid cooperation clause. In that case, it says insured's duty after injuries, each insured must cooperate and assist us in the investigation, settlement, defense, and enforcement of a contribution or indemnification claim. It was a much different clause. In that case, the insured, it's a little bit opposite of here, the insured said, I refuse to bring an indemnity claim. And the Court said, but the cooperation clause specifically says enforcement of contributions. It's more of a segregation world then where, you know, if I have a medical insurance that pays for my car wreck surgery, and then I win from the tort fees, or then I don't get to keep the money that the insurance company paid. I mean, I don't think that's really what we're talking about here. But the Eighth Circuit did make a point that said you can enforce that condition because it was an unqualified defense, and they made a big deal of it. That's not giving it up. That's getting it. That's getting it. That's what I'm saying. It doesn't support the position at all. If there's no other questions. So tell us about this whole money damages thing. Okay. Would it be fair to say that if we just have to throw up our hands about this endorsement clause versus the regular clause of the policy, that the endorsement then would govern? I think that's the cleanest way to coverage in this case is the endorsement. And let's keep in mind, they invoked the endorsement, not us. In their denial letter, they said, well, this is potentially covered under this professional liability endorsement. But for exclusion Q and but for the cooperation clause. In their pleading, the Second Amendment pleading in the district court, they said, it's potentially covered under this professional liability endorsement. In the 2001 policy, but for exclusion Q. In their discovery responses. Then we get to the summary judgment stage, and for the first time they said, you know what? You have to look to the 2008 policy. I will submit to this court, I don't think I'm going to have enough time, there is no way we could have ever looked to the 2008 policy. In 2001, when we tendered this claim, there was no 2008 policy. They defended this claim under the 2001. So I'm wondering about that, the issue of which policy applies. And I, granted, I have not done as thorough research as I would have liked to given time. But I was kind of looking at this as similar to these long-tail claims where you've got that issue, and then you have all these different policies. You try to figure out who covers what. But here it would all be the same company. So is it a no harm, no foul kind of argument? Does it matter when you have continuous coverage of the same, by the same insurer, which policy governs? Well, we argue to the district court that if they're going to take this position, if the court's going to take the position that we have to look, the policies are in the record already. The 2008 policies were already in front of the court in summary judgment. Just do an implied amendment. And the court refused to do it, said you should have sued under the 2008. No, but I'm saying usually this is a dispositive kind of thing because it would change the insurer. I mean, it would be, you know, huge. It would blow up the case. But here, other than this known loss thing, which strikes me as a tad circular, if we put aside the known loss issue, does it make a difference? Would the outcome be different under the text of the policies? I don't think under the text of the policies. But I think as a functional matter, the known loss does make it circular. Because when we did, for lack of a better word, call their bluff and we tendered it under the 2008 policy, which we only did after the court ruled on summary judgment that we have to, they denied it. And they denied it. Why? They said because you knew about the loss in 2001. So it was impossible. We couldn't have done what they actually said we could have done. I think the clearest thing in this one is if you look at footnote 271 of Judge Atlas's opinion. Judge Atlas said, it is noted that Midcontin's position that the professional liability endorsement offers absolutely no coverage is problematic. She then goes on to say it renders two provisions superfluous. I've practiced that word three times. She said, she essentially said, I would say, it's ambiguous, but I don't need to decide that because you should have made the claim under the 2008 policy. So Judge Atlas, again, footnote 271 says, this is an ambiguous clause. I don't know what it means. The money damages makes no sense the way that they put it in. There would have been no reason for them to add these exclusions unless they're going to cover money damages. There would be no reason for them to add a separate definition for money damages unless they intended to cover it. But I don't need to decide the issue because you, PSI, sued under the wrong policy. Doesn't an endorsement normally modify the coverage provisions? We agree. It does. In fact, it says it amends the insuring agreement. What they say is, well, it does amend. They acknowledge it amends the insuring agreement. They just say, well, it amends a different part. It doesn't actually say, well, pay for money damages. It amends the insuring agreement, but it only adds a D. Okay, so walk me through your best argument. Put aside cooperation clause and put aside known laws. Walk me through your best argument for coverage of the whole Type Flex judgment. I think the best argument actually is probably is our second alternative argument. We have two main arguments on the professional liability endorsement, and the first is that it's just a standalone. It's an endorsement like Judge Jones says. It amends the insuring agreement, and it says bodily injury, property damage, or money damages. It adds a defined term. Therefore, they have to cover money damages. And the district court ruled that the Type Flex judgment in its entirety was, in fact, money damages. No dispute. In their reply brief in this court, they said, well, we're not sure it's money damages, but below they said they acknowledge it was money damages. It's a money judgment. Right. It's a money judgment. What about the 3802G? That's a separate argument. So that's the third argument. The argument that I'm answering, Judge Haynes, what's our best argument? Our best argument, because you don't need to get to the segregation 802AG issue if it's all under the professional liability endorsement because the whole thing was a monetary judgment. You only get to the A versus G if you ignore the professional liability endorsement. Ignore now. What's that? Ignore now. The Texas Supreme Court case. Okay, but again, that issue is only applicable if the professional liability endorsement doesn't apply. Because the professional liability endorsement has its own definition. Correct. Of the phrase money damages, so we don't have to look to common law. Correct. But if we aren't looking at the endorsement, then we do look to common law, which is when now comes into play. Is that your argument? That is correct. Because the district court ruled that the entirety of the Type Flex judgment, it didn't matter if it was 82022A, 8202G, is a monetary judgment, meets the definition of money damages. The only reason why the court got into now and got into that distinction was because it said this professional liability endorsement doesn't apply. Now we look at the insuring agreement damages, and I hold that 8202G, the fee-shifting part, is not damages. Now, as a practical matter on now, I'll say this. Now exists. I understand that. Now was a Supreme Court of Texas opinion that is binding on this court, but I don't think it has anything to do with the undefined term damages in an insurance policy. In the Holybrook case, and I'm just going to say right here, in the Holybrook case, I'm not arguing about this court's holding as it relates to Louisiana law and the reddition statute. But in Holybrook, this court says when defining the term damages, whether to include attorney fees, this court said you have to give it its ordinary meaning. And there's lots of examples in Texas Supreme Court jurisprudence, Texas court, and the Fifth Circuit that doesn't give the word damages its technical legal meaning unless the policy requires it. And here the term damages were undefined. I simply would say NRA now doesn't control what a CGL, what an undefined term in a CGL policy. It's not the reasonable expectation. What does it mean nationally? Because these phrases tend to be in national policies, as you know, and we tend to be then able to look more nationally than we do in other cases. So tell me about that. It's split. It's split. So then that would be an ambiguity in the meaning of damages? I would say this to answer that, Judge Haynes. If they wanted to exclude attorney's fees, they should have excluded attorney's fees. Well, I'm sure they're busy rewriting the policy after 10 years of litigating this case. In 2007, they did add an exclusion for attorney's fees under the supplementary payments. It's not in our policy. Oh. Back to the long tail, right? The tail keeps getting longer. Okay. Mr. Martin. Thank you, Your Honor. May it please the Court. My name is Chris Martin on behalf of MidContinent today. We're asking the panel to reverse and render for two simple reasons. One, for a multitude of reasons, the type flex judgment is not covered. And number two, we believe Judge Atlas committed reversible error in her instruction to the jury with respect to the cooperation clause. With respect to the coverage issue, I think it's important to realize that this whole discussion you just had with Mr. Shedlovsky about the endorsement does not set aside the requirement that the type flex claims have to arise out of property damage or bodily injury. It's only when you come through that window, you get to the occurrence clause and the endorsement. Well, what about money damages from professional malpractice or misdeeds? You still have to have it arising out of a property damage claim or a bodily injury claim. For example, Your Honor, if you had an intentional defamation. Well, what does professional liability mean? It means it's ordinary meaning arising out of its professional operation of services. But the illustration I was going to give Judge Haynes is if in installing this underground storage tank there were later allegations of intentional defamation, the intentional defamation claim would never, ever, ever be covered because it's not property damage. It's not bodily injury. But this isn't exactly that. Now, I understand what you're saying. The actual lawsuit between Petroleum Solutions and type flex is not itself. That's your argument. It's not itself. But they wouldn't have been there but for the property damage. That's what Judge Head was claiming. I mean, we know that. And so, you know, how much more could it arise out of that? We just wouldn't be here without it. Sure. But the fact that some wild scenarios can arise out of it. But this isn't wild. The wild scenario is called Texas tort reform. Sure. And it's all connected. It's connected to who messed this up to cause heads damages. So it's not while we were busy installing a defective product we also punched somebody in the face because we didn't like them. Those you could say, well, while they happened at the same time, they're not connected. Here, all of this is centered on who done wrong. Sure. Right? Sure. And that's the type flex Petroleum Solutions lawsuit too. Who done wrong. Right. But Justice Jones' comment about the Texas tort reform twist takes it out of a bodily injury of property. That's got to be wrong. Because every bodily injury or property damage claim arising out of the malfunction of a product in Texas goes under a statutory regime. Sure. Well, the fact that it's statutory instead of common law doesn't make any difference. Sure. But the issue here is. So it arises out of. Right. But the question is the causes of action against the insured. The home versus PSI claims are clearly. What's your best case for this distinction? I'm not sure the issue has been distinct. That's because nobody ever thought of it before. Midcon, in my view, got into this pickle because of what Judge Haynes animated, which was you decided to defend under an almost indefensible reservation of rights, in which case you wouldn't have had them demanding, whether rationally or not, to not settle their claim against typeflex. Well, the problem is. And now you keep coming up with different rationales, it seems to me, during the course of litigation as to why it can't be the judgment isn't covered. Well, remember, Your Honor, we fully defended PSI against home. We fully defended PSI all the way to the Texas Supreme Court. The only question was whether or not a specific indemnity claim, not specified in the policy, never contemplated in underwriting, somehow gets swept in because of the occurrence definition. So having spent over a million dollars litigating the thing to conclusion, you're now arguing if we were to affirm the district court, you're arguing about $300,000 or $400,000, right? Several hundred thousand with the $187,000 in damages awarded by Judge Atlas plus a half million in legal fees. Well, no. Petroleum Solutions Legal. Correct. Their prosecution fees. Yeah. It's a puzzlement to me. I will tell you all that I told my colleagues that we have two of the very best insurance lawyers in the state of Texas, insurance coverage lawyers. It does puzzle me that we're here a decade later still litigating this, that y'all couldn't get this resolved. But that's neither here nor there. We have to resolve it. We get that. Okay. So getting back to the cooperation clause, let's suppose the case was my neighbor fell in my yard, sues me, my homeowner's insurance takes over, and my neighbor says, I'll settle for $5,000, well within policy limits, but I also want that painting that Judge Haynes' sister did that's in her house. Do I have to give that painting? Or am I failing to cooperate if I don't? It's not worth anything, sentimental entirely. My sister is a physicist, not a painter, but I don't want to give it up. So tell me about that. I don't think so because here it was distinguishable as a total walk away by both sides, and that's why it falls under the cooperation clause because it's the settlement of the entire lawsuit. And the walk away, which both defense counsel and— But I'd be walking away in my hypo. Let's say that we said we'll just settle for the painting. We like that painting so much. We'll just settle for that. Nothing. And they've got a—the guy was severely injured in a hole that was covered up on my lawn, and he was an invited guest. I mean the facts are really bad against me, but I just don't want to give up the painting. But you shouldn't have to because it's requiring you to do something extra. Here no one's doing anything extra. They're just walking away, and that's why it falls within cooperation. They're walking away from potentially valuable claim. It's a chosen action. You're going to say chosen actions don't have value? It has none here because they lost the connector. Their own defense counsel, their own independent counsel says we have no cause of action because of spoliation. We lost the connection. But you all were the ones who spoliated. Well, it was actually defense counsel, but defense counsel— That you hired? We paid for. Okay. That you hired? I'm not sure. I don't recall the record if we hired them or not. But the point is their own— But the Texas Supreme Court didn't agree on the spoliation point as to head. But if you weren't defending under a reservation of rights, they would have had no disincentive to settle. But the law requires us to defend under a reservation of rights. But what I'm saying is— No, it doesn't. If there is no valid basis for reservation of rights under the policy, then they would have been able to settle PSI with what they perceived as no risk. Sure, but the underground storage tank claims potentially raised numerous coverage issues which were addressed, ultimately didn't play out for home, and then ultimately for the tight flex portion played out in the lawsuit before us today. But the fact that you'd say to the insurance company, assume the defense before you investigate and know what the defense of the lawsuit is going to reveal, puts the insurance company in an untenable position. Yeah, but at any point you could switch to an unconditional defense. I mean you sent six reservation of rights letters. Sure, but here they couldn't— Especially when you said there's no liability here because it's not within statute of limitations. But the answer to both questions is we couldn't do that as long as the home claims remain. Your questions both assume we're just talking about tight flex versus PSI. We cannot waive— No, it's not assuming that at all. In fact, it's unassuming that because if we were only talking about tight flex and petroleum solutions, they would have walked away. But because of HED, or you're calling them home, whatever, because of that suit and the fear of that exposure, which the jury awarded quite a bit of money, they couldn't give up their one little potential safety valve. But the problem is their own defense counsel, their own independent counsel said that's worthless. There was no claim, Judge Haynes, because they didn't have the flex connector. And without that, there was nothing to preserve. So it was a ridiculous position, and as a result— Their own defense counsel that you hired? That we paid for, plus their independent counsel, Mr. McGurk. The one they hired, they paid for. McGurk has an email in the record that says this should be— But isn't that getting into kind of the reasonableness as opposed to the requirement? I mean, it seems to me there's sort of two questions here. Is there any obligation, period? Do they have to settle a claim that potentially could give them money if you all don't pay the main claim? Do they have to do that? And then if they do have to do that potentially, then we're into the fact question that the jury found for them. So I don't—I guess I'm having trouble with why this is a winner for you. Well, because— Because you kind of—you either lose the matter of law or lose the matter of fact. No, but on the second point, it's problematic because of Judge Alice's instruction to the jury where she added to the cooperation instruction a standard not recognized under Texas law that their conduct was reasonable or proper. And so under her jury instruction, you could have the jury saying, yep, they didn't cooperate at all, but we found it to be reasonable. That's never been Texas insurance law, ever. You can't have a reasonable breach of contract. You can't have a reasonable breach of the insurance policy. That's been Texas law— But you have this term cooperation that—I mean, cooperation typically, say, in a car wreck case, means you need to show up for your deposition, you need to help me enter interlocutories, whatever. But does it mean that you need to show up in my office at 1 in the morning? I'm demanding that you come at 1 in the morning and visit with me. Oh, you didn't cooperate. That would be unreasonable, right? Never, never. But here it's important to realize that the cooperation phraseology defines what it's talking about. But look, the jury also found that Mid-Continent waived it. Right, and the problem is— Well, so that doesn't—I mean, so it doesn't matter whether she screwed up on cooperation because they waived it. But the problem is there's no evidence of waiver because there are six reservation of rights letters we filed suit with— Yes, but then they go on and on in their reply brief about all the things that Mid-Continent actually did that were inconsistent with, you know, resting on this failure of cooperation policy. But those arguments highlight the problem with Judge Atlas's jury charge where she instructed the jury on the issue of silence being waiver when there wasn't a shred of evidence of that, when there's reservation of rights letters. But the reservation of rights letters do not spell out the cooperation clause issue you are now raising. In my experience with reservation of rights letters, granted I'm not U2, but my experience is you can't just go, hey, guys, we're reserving our rights. You've got to lay out what it is. I mean, I remember writing these letters and being terrified I would miss something. So it seems to me that just saying, hey, we've got this policy and, hey, here are clauses in it, doesn't lay out if you don't settle this type flex case, we will not cover because we will find that a violation of cooperation. It's not spelled out. There's two responses. Number one, the Texas Supreme Court has said if the insured accepts a defense under reservation of rights, all coverage issues are preserved. That answers the question that you just raised. Number two, we were as specific as we could. We raised the cooperation clause. Whoa, whoa, whoa. All coverage issues reserved are preserved. Correct. But I'm not sure you preserved this one because, again, it's got to be specific. It's not enough to say we have this policy with 3,000 attachments and, you know, this thing that goes on forever. You know, it used to take me days to read these policies to be sure I had everything matched up with everything. Somewhere in here there's a basis for us to deny coverage. It's not a good enough reservation of rights. And I agree with you. But in 2006 in the third reservation of rights letter through 2008 in the sixth reservation of rights letter, we raised the cooperation defense, and when it became a material – But you didn't even settle it. I mean, you were raising cooperation at a time when it was totally irrelevant. It didn't become relevant until July of 2008. Actually, Your Honor, I think it became relevant when the Supreme Court issued its decision, and we raised the issue three weeks later in the decision letter. That's why it's not waiver. That prior to the Supreme Court ruling, there was no materiality of what you just raised. You mean in the underlying case? Yes. That I don't know. I thought that was 2013. The underlying case came out of the 2008 trial, took all the way to 2014 and went to the Supreme Court. Right. When it was finally decided they could have resolved all of it. They didn't. But wait. I thought the whole business about settling with PSI occurred before the original trial. 2008, yes, ma'am. Right. And so the fact that you were reserving coverage for failure of cooperation at any time before then is precatory. It is a forecasting. It is contrary to the facts that existed. So it didn't become a realistic reservation until after 2008 or that. Because, Your Honor, my client was defending the underlying cases all the way through the Supreme Court. So if they win, these issues are immaterial. The Supreme Court did what they did. It became material for the first time. Let me ask it this way. I'm still saying the fact that you are ‑‑ does MidCon ordinarily send out a reservation of rights as soon as a claim is filed and say we will defend unless you don't cooperate? Is that what it says? It regularly puts cooperation language in the reservation of rights letters, and then when they become material it does what Judge Haynes talks about and it specifies the facts. Tell me which letter lays out if you don't settle the walkaway, as you call it, we will find this a violation of cooperation clause. Tell me that letter because I want to look at it again. Record site 6358, July 30, 2014, three weeks after the Texas Supreme Court issued it. Wait, wait, wait. But by then could they still settle? Of course not. That window. Okay. So then how ‑‑ But see, Your Honor, the problem with the question is that that window closed and so they erased it. Okay. Do you have a letter at a time when they still could have cooperated, as you call it, that would tell them, hey, you don't do this, we're going to find it a violation of the cooperation clause? Whether you need that letter or not, do you have it? No. Okay. Because that window closed. Okay, fine. I want to make sure you cover the Tideflux judgment issue that we just discussed. Why is it not true that if there's some ambiguity, if we can't make sense of the endorsement versus the regular policy, that the endorsement controls? Why is that not true? The endorsement does control. Okay. So why does that not cause you a problem? Because, as we talked about earlier, where it starts from, and this little blue handout I gave you, that it has to start with a bodily injury or property damage. Okay. Okay, so we're back to that. We're back to that. Okay. The second point would be in re nulli, or null, or however you pronounce that, because you still have a problem on the attorney's fees. But you would agree, if we are simply not looking at anything else, we're just looking at the definition of money damages, this is a monetary judgment. Attorney's fees are paid in money usually, although in some small communities, maybe they're paid in cow's milk or something. But for the most part, it's money. Sure. You could write a check and pay this judgment. Right. Somebody could. Okay. So it's a monetary judgment. Your point that you may, and I know what you're referring to, your point is it's caused by something not property damage. We're back to the defamation and all of that. Correct. There's two issues here, though. Money damages that get you into a occurrence, which is my middle step, but then you separate and apart have to have whatever you're recovering. And that's where in re nulli still applies. So you could still have your occurrence that's triggering coverage. Then there's a question of is that triggering defense or is that triggering indemnity? And if that's triggering indemnity, then it's a question of what kind of indemnity is it reimbursing for. And in re nulli says under unique Texas law, it's not damages. Attorney's fees are not damages. There's nothing unique about this idea that damages may or may not include attorney's fees. This has gone on forever. There's federal statutes that define costs to include attorney's fees or don't, or damages, you know. So there's nothing Texan about this. So I still don't understand. I understand if we ignore the endorsement, I think this is an issue that you have a very good argument on, that attorney's fees aren't damages. But if we don't ignore the endorsement, then we go by the ‑‑ I mean, if you defined a chicken as a four‑legged animal with a long neck, that would be a chicken. Even though nobody thinks of that as a chicken, they think of that as a giraffe. And that's the reason why I put the little box on the left‑hand side of the page that quotes the endorsement and gives you the record site, stating bodily injury, property damage, or money damages arising out of the professional services shall be deemed caused by the occurrence. So that just gets you past the first hurdle. You still have the second hurdle, which is what's your insurance claim. That's in re nulli. The endorsement does not take us out of in re nulli. It can't, or the endorsement turns the rule of law upside down. Then why is money damages defined to include judgments? To give an expansive definition of occurrence. It's just allowing the first hurdle to deal with that issue, but it doesn't get you the second hurdle of what's a compensable damage in an insurance policy. You still have to have covered damages, even if you have an occurrence. And so the fact there's two hurdles doesn't mean the first hurdle obliterates in re nulli. Okay, I want to ask you back to my perhaps not good long tail analogy. Why isn't this continuing coverage so that putting ‑‑ and I want you to explain the known loss argument and why that's not circular, but putting aside for the moment the known loss, it doesn't really matter which policy it is, and if we don't put aside the known loss, why isn't that circular? I don't think it matters which policy it is because it's the same insurance company and the same insured, but it is significant that you don't have bodily injury property damage for the type flex part of the judgment. You don't have the rendering of professional services as it relates to an indemnity claim. You've got a host of independent coverage problems that goes back to my initial analogy of an intentional defamation claim that arises out of the installation of this product and PSI says, oh, those idiots over at type flex. But you would agree that the known loss argument is a loser on the 2008? I'm not advocating that position. Okay. Okay. So the argument you're making is still the disconnectedness. It's not the policy year. It's the disconnectedness from what you have to have. Correct. And that applies whether it's 01 or 08 or any other time. An intentional defamation claim wouldn't be covered in 01 or 08 if they were defamed. And then that's your argument why the entire type flex judgment is not covered. Correct. So nobody is really advocating for Judge Atlas's approach. I mean, you'll take it as opposed to him winning everything, and he'll take it as opposed to you winning everything, but neither one of you all agrees with it. Is that fair? Okay. Judge Atlas is unquestionably one of the best judges in the circuit, but she messed up on that. Well, she did. I mean, the one thing I think we all will affirm is her finding that this is a law school exam hypo on steroids. Which is why Mr. Shedlovsky and I are here. Thank you all very much. We appreciate your evidence. Thank you very much. May I please report? Mr. Martin says he's not advocating that position, but that is the exact position they took in front of this court. Judge Atlas. Yeah, he just didn't want to look me in the eye and make an argument. And I appreciate that. It cannot be more clear in the reply brief. Look, I think the damage question, the money damage question, again, is footnote 271. Judge Atlas found it was ambiguous. This court, Fifth Circuit. Well, what about the whole, the central sort of causation argument that this is kind of like the defamation, like I'm sitting there installing this flex connector, and I call you a bunch of names. How would that be arising out of property damage? I put the defective flex connector, and I call you a thief. How would those two be connected? It happens that it's at that moment. I'm not sure. That's his argument. His argument is these are disconnected in the sense that the actual flex connector, you know, deficiencies is not the Titeflex PSI case. What's your response to that? I'm still not sure I understand you. Because this all encompassed within the Titeflex counterclaim. I mean, this whole thing arose, and, again, they invoked the professional. Well, I made that point with him. I'm trying to get you to respond. But I'm not sure I understand this. Well, he's the one who made it. I didn't make it. He made the intentional defamation. Help us understand his argument or deflect it. There is no. I mean, there was no finding of intentional defamation. That's before this Court. I mean, there's zero finding of it. I love it. I would go back to this. He's saying it's a disconnected matter. If it's disconnected, they wrote the policy. If the policy doesn't make sense, it's construed against them. No, he's saying that the money judgment is disconnected from the property damage. And I'll go back to Judge Jones' question as to why they define it. Why did they put it in an endorsement? Go back to the hydrotank case, which I think, surreptitiously, Judge Jones wrote. It says each policy provision is to the greatest extent possible to be given independent significance and effect. They are giving zero effect to the term money damages. Zero. Judge Atlas acknowledged that they were giving zero effect to the definition of money damages. She admitted in open court. She admitted in her opinion, I can't figure out what money damages means in this policy. But for lack of a better word, I'm going to punt the issue because of this 2008 issue. And I would submit to this Court that there is, again, no way. I stood up in open court after that ruling and said, Judge Atlas, if we tender this claim to them under the 2008 policy, based on what you're saying, Judge Haynes, that it's all the same coverage, if we tender, they're going to deny it. So we tendered it. And what did they do? They denied it. And why did they deny it? They said because you knew about the property damage in 2001. How is that disconnected? It all relates back to the initial claim. It all relates back to the head's initial claim. So you wouldn't have the petroleum solutions Tiflex case without the head damage. Correct. And that's the whole point, again, that I'm getting back to cooperation again, why Mr. Marnor argues, well, it was a complete walkaway. That makes a difference. It wasn't a complete walkaway. We were still facing a multimillion-dollar claim with a reservation of rights. I mean, let me, you know, money-mortgaging quarterback is not very good, but you have several attorneys suggesting that the property owner's claim was outside the statute of limitations as a matter of law, and that you just have to get up to wherever they would have to decide it. And then you have the expert having destroyed the critical evidence for the third-party claim. So your client is facing a sure loss on spoliation, at least not just on the merits, but also the exposure to attorney's fees, which is going to be a bunch of money, whereas they think they have a defense. I don't quite understand the rationality of their refusal, of their saying we have to maintain this claim, which is a bogus claim. I would say this, and I know the court said they didn't get to dig in the record, but the record is replete with inconsistent. There's plenty of opinions within the record where the court said, where the attorney said, well, this is a difficult claim, but we still think it's a viable claim. But even when they said, you know what, this is a difficult claim to maintain it, what they always said and consistently said was we don't think Titeflex's claim against you is a valid claim under Texas law. So you have two losers against you. They lost. We lost on that issue, but it's not that PSI was getting advice from the counsel hired by MidCon and that, oh, you're going to lose, you're going to lose, you've got to do this. The reason why they wanted us to settle the case, and this is clear from the record, is because they didn't want Titeflex to make Head's case better, not because they thought the claim was a loser. I'm out of time. Thank you. Thank you.